97 A.3d 310

COMMONWEALTH of Pennsylvania, Appellant

v.

Mark WALLACE, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Mark Green, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Mark Green a/k/a Mark Wallace, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Mark Wallace, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Mark Wallace, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Mark Wallace, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

James Smith, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Mark Wallace, Appellee.

Supreme Court of Pennsylvania.

Submitted Sept. 9, 2013.

Decided July 21, 2014.

Hugh J. Burns Jr., Esq., Michael Lee Erlich, Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

Jonathon Mark Frisby, Esq., for Mark Green, Mark Wallace, a/k/a Mark Green, James Smith a/k/a Mark Green.

Michael Hardiman, Esq., Philadelphia, Henry McGregor Sias, Esq., for Philadelphia Lawyers for Social Equity.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice STEVENS.

The Commonwealth appeals from the order of the Superior Court vacating and remanding the orders of the Court of Common Pleas of Philadelphia County, which denied Appellee's motions for expungement of charges contained in multiple non-conviction arrest records.

### *Facts*

Appellee has a vast criminal history, beginning as a juvenile and continuing well into his adult life. Between 1988 and 1992, Appellee was arrested twelve times in Philadelphia and charged with the following: aggravated assault, carrying a firearm without a license, carrying a firearm on public streets or property, resisting arrest, unsworn falsification to authorities, securing documents by deception, theft by deception, using altered, forged or counterfeit documents, passing bad checks, theft of services and retail theft.[1] On March 31, 1992, Appellee was charged and convicted of three counts theft by deception [2] and sentenced to three years' probation. During this period, Appellee was also charged with multiple instances of the following: criminal conspiracy, terroristic threats, reckless endangerment, simple assault, forgery, credit card fraud, theft by unlawful taking or disposition, theft by receiving stolen property, theft by deception, and unauthorized use of a

1. 18 Pa.C.S. § 2702; 18 Pa.C.S. § 6106; 18 Pa.C.S. § 6108; 18 Pa.C.S. § 5104; 18 Pa.C.S. § 4904; 18 Pa.C.S. § 4114; 18 Pa.C.S. § 3922; 75 Pa.C.S. § 7122; 18 Pa.C.S. § 4105; 18 Pa.C.S. § 3926; 18 Pa.C.S. § 3929.

2. 18 Pa.C.S. § 3922.

motor vehicle.[3] These charges did not result in acquittals or convictions, and the record is unclear as to the ultimate outcome of each of these charges.

A United States Postal Inspector began investigating Appellee in 1992 on suspected mail fraud charges. Upon learning of the investigation, Appellee used a contact in the Philadelphia police department to attempt to obtain the inspector's home address. When this failed, Appellee enlisted the help of a cohort, who called the inspector and threatened to blow up his car. Appellee was ultimately indicted by a federal grand jury of seven counts of bank, credit card, and mail fraud and possessing and uttering a forged security.[4] Appellee pled guilty to each of these charges. He was also tried and convicted of threatening a federal law enforcement officer.[5] Appellee was later awarded a new trial for this charge, but ultimately pled guilty.

As a result of these convictions, Appellee was incarcerated in federal prison until 1997, and almost immediately after being released, was charged and pled guilty to Public Assistance Act violations and Medicaid fraud after applying for food stamps, public assistance and medical benefits under three different names.[6]

On October 30, 1998, Appellee was arrested in connection with the fire-bombing of his estranged girlfriend's residence and car, and was later tried and convicted of conspiracy to commit arson.[7] Meanwhile, on October 30, 1998, Appellee was arrested for endangering the welfare of children, unlawful restraint, kidnapping, and false imprisonment.[8] These charges were later withdrawn.

3. 18 Pa.C.S. § 903; 18 Pa.C.S. § 2706; 18 Pa.C.S. § 2705; 18 Pa.C.S. § 2701; 18 Pa.C.S. § 4101; 18 Pa.C.S. § 4106; 18 Pa.C.S. § 3921; 18 Pa.C.S. § 3925; 18 Pa.C.S. § 3922; 18 Pa.C.S. § 3928.

4. 18 U.S.C. § 1344; 18 U.S.C. § 1029(a)(2) and (a)(3); 18 U.S.C. § 1341; 18 U.S.C. § 513.

5. 18 U.S.C. § 115(a)(1)(B).

6. 62 P.S. § 481; 62 P.S. § 1407.

7. 18 Pa.C.S. § 3301.

8. 18 Pa.C.S. § 4304; 18 Pa.C.S. § 2902; 18 Pa.C.S. § 2901; 18 Pa.C.S. § 2903.

Appellee was incarcerated on his Public Assistance Act violation, Medicaid fraud, conspiracy conviction and violating the terms of his federal supervision, and was released in October of 2006. From January 2007 to May 2007, Appellee was arrested for two counts receiving stolen property, two counts unauthorized use of a motor vehicle, aggravated assault, terroristic threats, simple assault, and reckless endangerment, all of which were eventually withdrawn.[9]

In December 2007, Appellee was federally indicted and in November 2009, convicted of access fraud conspiracy, aggravated identity theft and two counts of unauthorized use of an access device in connection with a scheme in which he used an individual's credit card to purchase over $400,000 worth of goods and services.[10] The federal judge in this case determined Appellee to pose a "serious risk of flight," as he was able to take on many aliases and had access to large amounts of cash. Appellee was ultimately sentenced to an aggregate term of over eleven years' incarceration in a federal prison in Otisville, New York.

Appellee's disciplinary problems did not end with his most recent incarceration. While incarcerated, Appellee has been disciplined for stabbing another inmate in the eye with a writing utensil, attempting to stab this same inmate in the eye with a sharpened broomstick, and refusing to drop his weapon when ordered to do so by prison officials.

Appellee's lengthy criminal record spans 14 pages with a total of 228 charges, terminating in the following: four convictions, four guilty pleas, fourteen withdrawals, fifty-three dismissals, forty-four *nolle prosequi*, three transfers to family court, sixteen acquittals, five sustained demurrers, thirty transfers to the juvenile division, and fifty-five held for court.

Between April 2010 and January 2011, Appellee filed eight separate *pro se* petitions in Philadelphia under the name Mark Wallace, or one of his aliases, Mark Green or James Smith,

9. 18 Pa.C.S. § 3925; 18 Pa.C.S. § 3928; 18 Pa.C.S. § 2702; 18 Pa.C.S. § 2706; 18 Pa.C.S. § 2701; 18 Pa.C.S. § 2705;

10. 18 U.S.C. § 1029; 18 U.S.C. § 1028.

seeking destruction of fingerprints, photographs, and arrest records from past charges that had not resulted in convictions. Although difficult to discern from Appellee's brief and his lengthy criminal record, the Commonwealth estimates that Appellee sought in total the expungement of approximately 150 charges.

After determining that hearings were unnecessary, the trial court denied each of Appellee's eight petitions in separate orders issued from May 2010 to March 2011. Appellee appealed each of these orders to the Superior Court, filing eight notices of appeal between June 2010 and March 2011. On May 2, 2011, the trial court granted the Commonwealth's April 15, 2011, motion to consolidate seven of the appeals. On October 28, 2011, the trial court granted the Commonwealth's June 28, 2011, motion to consolidate Appellee's eighth and final appeal with the prior seven appeals.

Between August 2010 and April 2011, the trial court issued a similar, if not identical, Pa.R.A.P. 1925(a) opinion for each of Appellee's appeals from the denial of his respective expungement petitions. The trial court determined that Appellee had waived all issues in two appeals, those docketed at 1894 EDA 2010 and 2850 EDA 2010, for failure to comply with the trial court's order to file timely Pa.R.A.P. 1925(b) Statements.

In addition, for all the appeals, the trial court concluded that Appellee's expungement petitions should fail on the merits. The trial court first noted, correctly, that the decision to grant or deny an expungement rests within the discretion of the trial court, which must balance the "individual's right to be free from the harm attendant to maintenance of the arrest record against the Commonwealth's interest in preserving such records." *Commonwealth v. Wexler,* 494 Pa. 325, 431 A.2d 877, 879 (1981). The court then listed the factors that must be considered in conducting this balancing test: (1) the strength of the Commonwealth's case; (2) the Commonwealth's reasons for wishing to retain the records; (3) the petitioner's age, criminal record, and employment history; (4) the length of time between the arrest and the petition to expunge; and (5)

the adverse consequences the petitioner may endure if expungement is denied. *Id.*

In conducting the required balancing test, the trial court determined that the Commonwealth's readiness to try Appellee for the charged offenses, Appellee's age and employment history, and the period of time between arrests and expungement should be afforded little weight. The trial court based its denial of Appellee's expungement petitions by balancing the Commonwealth's reasons for seeking to retain the records (factor 2), Appellee's extensive criminal record (factor 3), and the lack of specific adverse consequences Appellee would encounter if expungement were denied (factor 5).

The trial court explained that the Commonwealth has a compelling interest in retaining Appellee's arrest records because he is currently incarcerated in federal prison and, if he commits an offense while in prison or violates his subsequent parole, his state records would be relevant in assessing appropriate punishment.[11] The trial court reasoned that Appellee would be unlikely to encounter any negative repercussions from the denial of the expungement because his remaining criminal record, which includes numerous state and federal convictions for crimes of violence and crimes of fraud, would render the expungement he sought of little or no consequence.

The trial court also concluded that the purpose of expungement, *i.e.* to protect Appellee against the stigma associated with an arrest record, would not be served by granting Appellee's expungement petitions, as Appellee has numerous arrests and convictions not subject to expungement.

Appellee appealed each denial to the Superior Court, which consolidated the eight appeals and ultimately reversed the trial court in a published opinion. Appellee asserted that the trial court abused its discretion by denying his motion to expunge his arrest record and failing to hold a hearing.

First, the Superior Court concluded that "[b]oth Appell[ee] and the trial court satisfactorily fulfilled the requirements of

11. *See* 61 Pa.C.S. § 6135(a)(7) (the parole board must consider a prisoner's "complete criminal record" prior to release).

[Pa.R.A.P. 1925] in each appeal." *Commonwealth v. Wallace,* 45 A.3d 446, 450 n. 3 (Pa.Super.2012). The Superior Court thus disagreed with the trial court and concluded that Appell[ee] had not, in fact, waived two of his appeals for failure to file a timely 1925(b) statement, but the Superior Court did not provide any reasoning or citations to the record for this conclusion.

The Superior Court next concluded that the trial court improperly based its denial of Appell[ee]'s expungement motions on a general assumption that Appell[ee] might offend again, specifically characterizing the trial court's holding as imposing a "volume penalty based on the sheer length of Appell[ee]'s arrest record and on speculation that he may reoffend in prison or in Philadelphia County." *Id.* at 453. The Superior Court rejected this rationale based on its reading of precedential decisions rejecting " 'general record-keeping interest' and 'future case' arguments." *Id.* at 453–54 (citing *Wexler, supra* at 882; *Commonwealth v. D.M.,* 444 Pa.Super. 299, 663 A.2d 792, 793 (1995); *Commonwealth v. A.M.R.,* 887 A.2d 1266, 1270 (Pa.Super.2005)).

Having rejected the trial court's *Wexler* analysis, the Superior Court then concluded that "some of Appell[ee]'s non-conviction arrest records may be eligible for expungement." *Wallace, supra* at 454. However, due to confusion from the record at hand, the Superior Court was unable to determine which specific charges might be subject to expungement, and so the court remanded to the trial court for a clarification of the record and a clarification of the trial court's decision. *Id.* Specifically, the Superior Court strongly suggested that the parties "provide a comprehensive list of each criminal action number in question with the disposition of each charge contained therein," and directed the trial court to apply the *Wexler* factors "to determine in each particular case whether justice requires expungement." *Id.* Finally, citing its own precedents, the Superior Court concluded that Appell[ee] was entitled to a hearing on remand. *Id.* (citing *Commonwealth v. Rodland,* 871 A.2d 216, 221 (Pa.Super.2005); *Commonwealth v. Maxwell,* 737 A.2d 1243, 1245 (Pa.Super.1999) (stating "an

individual must be afforded a hearing to present his claim that he in entitled to an expungement")).

The Commonwealth filed a Petition for Allowance of Appeal with this Court, which was granted on March 22, 2013. We accepted the following issue, as framed by the Commonwealth, for review:

Did the Superior Court err by holding in a published opinion that an incarcerated career criminal has a due process right to a hearing at which the trial court must determine—on a charge by charge basis—whether over a hundred prior criminal charges against him should be expunged?

*Commonwealth v. Wallace*, 619 Pa. 383, 64 A.3d 620 (2013) (per curiam).

### *Arguments*

The Commonwealth argues five reasons we should not extend an expungement remedy to persons who have been convicted and are currently incarcerated. First, the Commonwealth asserts that "persons at liberty and prison inmates are not similarly situated for purposes of the due process clause." Commonwealth's Brief at 14. The Commonwealth notes that it is well precedented that with incarceration comes the loss or restrictions of many significant rights and liberties.[12] The Commonwealth asserts that a limitation on an inmate's ability to petition for expungement during the time the inmate is incarcerated is "among the least onerous of those restrictions." Commonwealth's Brief at 15.

Second, the Commonwealth contends that the primary purposes behind the law of expungement have little application in a prison setting. One of the underlying principles behind the law of expungement is the protection of an individual's reputation. *Carlacci v. Mazaleski*, 568 Pa. 471, 798 A.2d 186, 189 (2002). The Commonwealth argues that during an inmate's time in prison, his reputation has already been tarnished, and

12. *See, e.g., Payne v. Commonwealth*, 582 Pa. 375, 871 A.2d 795, 809 (2005) ("prison inmates do not enjoy the same level of constitutional protections afforded to non-incarcerated citizens").

therefore expungement of past arrests would not aid in protecting the inmate's reputation. Expungement is also used as a tool to prevent undue hardships of loss of employment, housing or education that may accompany one's criminal record. *Commonwealth v. Armstrong*, 495 Pa. 506, 434 A.2d 1205, 1207 (1981). The Commonwealth asserts that although expungement for the purpose of preventing undue hardships from the denial of employment is useful to a person competing in the open job market, the same cannot be said for prisoners currently incarcerated.

Third, the Commonwealth argues that both judicial and penal authorities have a vital interest in retaining access to prisoner's criminal history information. The Commonwealth asserts that if an inmate needed to be disciplined for misconduct while incarcerated, a complete and accurate criminal record would assist penal authorities in fashioning an appropriate punishment. Furthermore, 61 Pa.C.S. § 6135(a)(7) states that a parole board is to consider a prisoner's "complete criminal record" prior to release on parole. 61 Pa.C.S. § 6135(a)(7).

Fourth, the Commonwealth points to serious practical difficulties that would follow if we make a policy decision to allow inmates to petition for expungement while still incarcerated. The Commonwealth asserts that a decision in favor of Appellee will lead to an unreasonable strain on an already overburdened trial court system. The Commonwealth contends that judicial endorsement of inmate petitions will lead to many prisoner requests to be present at the hearing, as Appellee has requested, and that this outcome will inevitably raise security concerns among prison officials.

Finally, the Commonwealth argues that any disadvantage that may result from an inmate's denial of a petition for expungement while still incarcerated is only temporary, as there is nothing to prevent the inmate from petitioning for expungement once released from state or federal custody.

Appellee first argues that the remand ordered by the Superior Court was appropriate, as the trial court denied Appellee expungement of any and all of his criminal records, including

acquittals, which Appellee contends this Court directs should be expunged automatically. See, *Commonwealth v. D.M.*, 548 Pa. 131, 695 A.2d 770, 773 (1997). ("In cases of acquittal, however, we hold that a petitioner is automatically entitled to expungement of his arrest record").

Appellee next contends that the Commonwealth, and not Appellee, is at fault for the size of Appellee's criminal record. Appellee argues that this bulk was created by the Commonwealth's own charging decisions and, therefore, the Commonwealth "cannot blame the appellee for attempting to rid himself of the burden of those extraneous charges . . ." Appellee's Brief at 7. Appellee further argues that "It is not the appellee but the Commonwealth that has crafted a fourteen-page Court Summary . . ." Appellee's Brief at 7.[13] Appellee urges, however, that despite the tremendous size of Appellee's criminal record, the hearing in this case on remand should take no more than an hour of the court's time. Appellee offers little support for this conclusion, other than the fact that "most proceedings like this take little more than fifteen minutes." Appellee's Brief at 8.

Appellee further asserts that the Commonwealth relied on the "mere assertion of general interest" in retaining Appellee's full criminal record, as is forbidden by *Wexler*, and Appellee was egregiously denied the opportunity to respond or to make an objection. Appellee's Brief at 10.

Finally, Appellee contends that because the expungement statute is remedial, any exceptions to the statute must be narrowly construed, and therefore, this Court should find that inmates are entitled to the same expungement proceedings as individuals at liberty.

### Discussion

*Expungement as a Right*

■ This Court has consistently found that the right in this Commonwealth to petition for expungement of criminal rec-

13. We note that Appellee has not alleged that he was ever arrested without probable cause. Appellee merely asserts that the Commonwealth's charging record is too lengthy.

ords is an adjunct of due process. *Carlacci, supra* at 188. The decision to grant or deny a petition for expungement lies in the sound discretion of the trial court, who must balance "the individual's right to be free from harm attendant to maintenance of the arrest record against the Commonwealth's interest in preserving such records." *Wexler, supra* at 879.

 Judicial evaluation of a petition to expunge depends on the manner of disposition of the charges an individual wishes to expunge.

When an individual has been convicted of the offenses charged, then expungement of criminal history records may be granted, only under very limited circumstances that are set forth by statute. When a petitioner has been tried and acquitted of the offenses charged, we have held that the petitioner is automatically entitled to the expungement of his arrest record. When a prosecution has been terminated without conviction or acquittal, for reasons such as nolle prosse of the charges or the defendant's successful completion of an accelerated rehabilitative disposition program ("ARD"), then this Court has required the trial court to balance the individual's right to be free from the harm attendant to the maintenance of the arrest record against the Commonwealth's interest in preserving such records.

*Commonwealth v. Moto,* 611 Pa. 95, 23 A.3d 989, 993 (2011)(internal citations omitted). We note that the Superior Court erred in its analysis of some of the above principles. Namely, the Superior Court stated, "Where charges are terminated for reasons other than acquittal, such as *nolle prosequi* based on insufficient evidence or successful completion of ARD, expunction should be granted." *Wallace, supra* at 453. This is an incorrect statement of law, for, as stated *supra,* the trial court must balance the individual's interest against the Commonwealth's interest when a prosecution has been terminated without conviction or acquittal.[14]

14. We note that Appellee's contention that acquittals must be expunged, is not of issue instantly, as Appellee has waived his only appeal containing acquittals for failure to file a timely 1925(b) statement in accordance with trial court orders. The trial court found that Appellee

 In *Wexler*, this Court set in place the following five factors that the trial court must balance when considering a petition for expungement:

(1) The strength of the Commonwealth's case against the petitioner; (2) the reasons the Commonwealth gives for wishing to retain the records; (3) the petitioner's age, criminal record, and employment history; (4) the length of time that has elapsed between the arrest and the petition to expunge; (5) and the specific adverse consequences the petitioner may endure should expunction be denied.

*Wexler, supra* at 879.

 The Superior Court's conclusion that trial court failed to consider Wexler factors lacks support in the record. This Court has consistently held that there is a presumption that when a court has a set of facts in its possession, it will apply those facts. *Moto, supra* at 995 (Pa.2011). Moreover, where the trial court has the record in its possession, we do not require the court to prove that it reviewed the entire record by citing to each and every circumstance it considered in its findings. *Id.* at 995–996. The trial court, instead, must explain the rationale of its decision in a sufficiently legal and factual manner to support its decision under *Wexler. Id.* at

waived the issues contained in two of his appeals to the Superior Court, namely Appeal No. 1894 EDA 2010 (No. 315 EAL 2012) and Appeal No. 2850 EDA 2010 (No. 318 EAL 2012) by failing to timely file Rule 1925(b) statements in accordance with court orders. On July 13, 2010, the trial court filed orders directing Appellee to file a Rule 1925(b) statement within 21 days. The trial court then filed an Order on August 26, 2010, regarding 1894 EDA 2010, and on October 18, 2010, regarding 2850 EDA 2010, each finding that Appellee had waived the issues in these two appeals for failing to timely file Rule 1925(b) statements. The Superior Court did not address this issue of waiver in its Opinion, instead baldly stating, "Both [Appellee] and the trial court satisfactorily fulfilled the requirements of Pennsylvania Rule of Appellate Procedure 1925 in each appeal." *Wallace, supra*, at 452–53. The records indicate, however, that Appellee did not file 1925(b) statements for these two appeals until October 26, 2010, well after the 21 day deadline set in the trial court's July 13, 2010 Order. We therefore find that the Superior Court erred in finding that Appellee had satisfactorily fulfilled the requirements for Pa.R.A.P. 1925 with regards to 2850 EDA 2010 and 1894 EDA 2010, and find that the issues in these two appeals have been waived. Appeal No. 2850 EDA 2010 (318 EAL 2012) is the only appeal at issue where some of the charges resulted in acquittal.

996. Instantly, the trial court provided sufficient factual findings for adequate appellate review. The trial court explained the *Wexler* balancing test, listed each of the five factors of the test, and applied the facts of the current case to these factors. The trial court first found that several of the factors neither supported nor impugned denial of the petition, and were thus afforded little weight (specifically, the Commonwealth's readiness to try Appellee for the charged offenses, Appellee's age and employment background, and the period of time between the arrests and the expungement petition).

The trial court then applied the facts to the remaining factors and found that the Commonwealth's basis for retaining the records, Appellee's criminal record, and the specific adverse consequences Appellee may encounter if expungement is denied, all weigh heavily in favor of denial of expungement. First, the trial court found that the Commonwealth has a compelling interest in retaining the records Appellee seeks to expunge, as Appellee is currently incarcerated and these records may be needed for use in penalization if Appellee commits any offenses while in prison (as discussed *supra*, Appellee has committed violent offenses while in prison) or the records may be of use when determining issues of parole.

Appellee argued, and the Superior Court agreed, that the trial court improperly accepted the Commonwealth's "general record-keeping interest" and "future case" arguments. We disagree. While it is accurate that the Commonwealth's generalized concern for record-keeping or its reliance on future cases is not a sufficient basis for denying a petition for expungement, the trial court's findings in this case are based upon more than a generalized concern for record-keeping or reliance on future cases. The Commonwealth's interests are not generalized, rather they are grounded in the reality of Appellee's vast criminal history, his status as a prison inmate, his numerous state and federal convictions for crimes of violence and fraud, and his recidivism. The Commonwealth is not merely speculating that Appellee may re-offend while in prison; Appellee has, in fact, already committed violent offenses while incarcerated. Further, the General Assembly

has instructed parole boards to consider a prisoner's "complete criminal record" prior to release. 61 Pa.C.S. § 6135(a)(7). It follows, therefore, that the parole board has more than a general interest in maintaining Appellee's criminal history while Appellee is still incarcerated.

The trial court then weighed the specific interests of the Commonwealth listed *supra*, with the specific negative repercussions Appellee might face as a result of the denial of his petition and found that the Commonwealth's interests far outweigh Appellee's repercussions. To this end, the trial court noted that because the rest of Appellee's criminal record is so vast (Appellee's state and federal convictions), it is unlikely that he will face specific negative repercussions based on the remainder of his record that he seeks to expunge.

The trial court further analyzed the *Wexler* factors with the purpose of the underlying expungement. Expungement is a mechanism utilized to protect an individual's reputation from the stigma that accompanies an arrest record. The trial court opined that granting an expungement in this case would neither enhance Appellee's employment opportunities nor assist Appellant in casting off the stigma of the charges, as the rest of Appellee's arrest record and record of his felony convictions still exist.

Because the trial court's findings are sound and strongly supported by the record, we find no reason to disturb the trial court's holdings.

*Due Process*

We are now left to decide the broader question of whether the Superior Court erred in holding that an inmate has a right to petition for expungement For reasons stated infra, we find that due process does not guarantee this right to an inmate while still incarcerated.

*Eldridge Test*

The due process clauses of the United States and Pennsylvania constitutions "embody the principle of fundamental fairness, entitling every individual to be free from arbitrary or .

oppressive government conduct." *Commonwealth v. Kratsas,* 564 Pa. 36, 764 A.2d 20, 27 (2001). This Court has found that the guarantees associated with the due process clause of the federal constitution are "generally coextensive with those under the Pennsylvania Constitution." *In re F.C. III,* 607 Pa. 45, 2 A.3d 1201, 1212 (2010).

This Court has acknowledged that "prison inmates do not enjoy the same level of constitutional protections afforded to non-incarcerated citizens." *Payne, supra* at 809, citing *Bronson v. Central Office Review Committee,* 554 Pa. 317, 721 A.2d 357, 359 (1998). Because of the unique requirements of prison settings, imprisonment "carries with it the circumscription or loss of many significant rights." *Payne, supra* at 809, citing *Small v. Horn,* 554 Pa. 600, 722 A.2d 664, 669–70 (1998).

The Superior Court found that Appellee was entitled to a hearing to determine which non-conviction arrests records, if any, are eligible for application of the *Wexler* factors, and based on the application of those factors, which non-conviction records should be expunged. The Commonwealth urges this Court to reverse the Superior Court's decision and find that inmates are not afforded the right to petition for expungement while incarcerated. Appellee argues that denying this right to inmates would constitute a denial of due process.

When determining whether state action offends the due process guarantees of the Fourteenth Amendment, this Court has adopted the United States Supreme Court's three factored balancing test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The factors that must be considered are as follows:

First, the private interest that will be affected by the official action; second the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements will entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

First, we must consider the private interest that Appellee contends will be affected if he is denied the right to petition for expungement. Appellee argues that incarcerated individuals are among those most in need of expungement's ameliorative purpose. Specifically, Appellee contends that it would be an injustice to "deny to incarcerated people the hope that they might productively use their time of incarceration in order to begin to repair their reputation and prepare to become a more employable and functional member of society upon reentry." Appellee's Brief at 11.

Reputation is a protected private interest in this Commonwealth. Article I Section 1 of the Pennsylvania Constitution reads: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. Art. 1 § 1.

Appellee insists that his fourteen-page criminal abstract could be reduced to one or two pages, and that left as is, his lengthy criminal record will be an obstacle to obtaining employment and housing once he is released from federal prison. He urges this Court to consider his petitions for expungement as a diligent attempt to prepare for his release back into society. Although Appellee does not specifically make a claim of the protected private interest of reputation, claims of loss of employment opportunities or housing due to a lengthy criminal record suggest such a claim.

Next, we must consider the risk of an erroneous deprivation of Appellee's private interest in his reputation if he is denied the right to petition for expungement. We find that the risk of such an erroneous deprivation is slim. Appellee asserts that by petitioning for expungement, he is attempting to aid his effort for a successful reentry into society. Appellee asserts that due process requires a hearing to establish a

record whereby the Commonwealth may establish facts and Petitioner may respond.

Appellee would have this Court believe that if we were to deny him the right to petition for expungement while still incarcerated, he would never again have the opportunity to be heard on the subject. To the contrary, there is nothing preventing Appellee from petitioning for expungement once he is released from custody.

Moreover, Appellee does not acknowledge other avenues available to him while incarcerated that will aid in repairing his reputation and prepare him to become a more employable and functional member of society. Appellee is serving time in federal prison and has served time in state prison for a reason; he was **convicted** of crimes. Though an expungement of some of Petitioner's charges that did not end in convictions would shorten the length of his record, Petitioner will still have these convictions as a part of his criminal history, and an expungement of other charges will not erase the stigma that follows a convicted felon. The Pennsylvania Department of Corrections has put in place programs to assist inmates with the process of reentering society such as education programs, community reentry programs and release preparation programs that Appellee may participate in if he wishes to prepare to become a more employable and functional member of society upon release.

Lastly, we must consider the Government's interest in denying an expungement hearing while an individual is still incarcerated. As discussed *supra*, the Commonwealth's stated interests for denying such a hearing are well-founded. The Commonwealth has a compelling interest in retaining the records Appellee seeks to expunge, as Appellee is currently incarcerated and these records may be needed for use in penalization if Appellee commits any offenses while in prison (Appellee has, in fact, committed violent offenses while in prison). Moreover, a complete criminal history record may be needed in order to determine an inmate's eligibility for parole. *See,* 61 Pa.C.S. § 6135(a)(7) (the parole board must consider a prisoner's "complete criminal record" prior to release).

The more practical concerns of affording inmates the right to petition for expungement while still incarcerated must not be overlooked. As the Commonwealth suggests, these concerns are well illustrated by the present case where Petitioner, currently in federal custody in New York, has filed multiple petitions seeking to appear in person to present evidence to the Pennsylvania Court of Common Pleas. Granting such a request would necessitate the transport of Petitioner across state lines, which would put a strain on already tight prison budgets and add to an already overburdened trial court system. Moreover, any time an inmate is transported out of the prison setting, there exist security concerns, especially when the inmate, like Petitioner, is considered a flight risk.

For the foregoing reasons, we find that an inmate does not have the right to petition for expungement while incarcerated. Accordingly, the order of the Superior Court reversing the orders of the Court of Common Pleas of Philadelphia County is vacated and the orders of the Court of Common Pleas of Philadelphia County are reinstated.

Chief Justice CASTILLE, Justices SAYLOR, EAKIN, BAER, TODD and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice EAKIN joins.

Justice SAYLOR files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion, and write separately only to highlight the following point of law.

Appellee relies on *Commonwealth v. D.M.*, 548 Pa. 131, 695 A.2d 770, 773 (1997), which broadly stated: "In cases of acquittal, ... we hold that a petitioner is automatically entitled to the expungement of his arrest record." The Majority successfully resolves this case through application of the settled factors on expungement from *Commonwealth v. Wexler*, 494 Pa. 325, 431 A.2d 877 (1981), but does not speak to *D.M.* itself. In order that expungement matters may be conducted

upon a clear understanding of our precedent, I believe some discussion of *D.M.* may be useful to the bench and bar.

The pronouncement in *D.M.* that acquittal automatically entitles an accused to expungement of his arrest record can, indeed, be read expansively. But, the *D.M.* case, like any other precedent, must be read against its facts. As we reaffirmed in *Scampone v. Highland Park Care Center, L.L.C.*, 618 Pa. 363, 57 A.3d 582 (2012): "[T]his Court's decisions are read against the facts because our decisional law generally develops incrementally, within the confines of the circumstances of cases as they come before the Court.... [W]e aspire to embrace precision and avoid the possibility that words or phrases or sentences may be taken out of context and treated as doctrines." *Id.* at 604–05 (quotation marks and internal citations omitted). In this case, the Commonwealth specifically challenges the propriety of reading this statement from *D.M.* too liberally. In my view, the Commonwealth's suggestion is persuasive.

In *D.M.*, the defendant was a schoolteacher with no criminal background and no history of incarceration who sought expungement of his arrest record after being acquitted of charges of misdemeanor indecent assault and corruption of a minor, which arose from a single isolated incident involving disputed facts. In the present matter, the Commonwealth does not attack the result of *D.M.* on its facts, but rather draws the obvious distinction between appellee's lengthy career in crime, embracing decades and hundreds of criminal actions, leading to his current incarceration status, compared to cases where defendants seeking expungement "were attempting to obtain employment and protect their reputations while free members of society." Commonwealth's Brief at 14 (citing *D.M.* and *Wexler* (parents of minor child who dealt marijuana out of family residence were charged with corruption, possession, and conspiracy offenses that were ultimately *nolle prossed* and dismissed; this Court held that expungement of parents' arrest records was permissible)). The Commonwealth emphasizes that our precedent "has never extend-

ed an expungement remedy to persons [like appellee] who have been convicted and are presently incarcerated." *Id.*

The Commonwealth's position is correct. The *D.M.* Court had no occasion to address, and did not address, a factual situation similar to the one presented in this case, nor indeed, the timing of just when expungement by right may or should occur. The broad statement in *D.M.* does not automatically require expungement of past criminal and arrest records of a still-incarcerated defendant.[1] Indeed, there are instances where offering the prospect of expungement to incarcerated individuals is obviously absurd, such as cases involving defendants sentenced to death or to life imprisonment. Query: why should executive and judicial resources be devoted to pruning away prior charges leading to acquittal for persons with no realistic prospect of ever reentering society? They should not be, as the Majority makes clear. To engage in an expungement procedure in this matter, given appellant's deplorable criminal history, would be merely an academic exercise.

Justice EAKIN joins this opinion.

Justice SAYLOR, concurring.

I join the majority opinion, as I believe that its constitutional assessment is correct as applied in the present circumstances and, at least as a general proposition, some restraints on inmates' ability to petition for expungement during their terms of incarceration will assist in cabining the impact of prisoner litigation on limited judicial and public resources. Since, however, we have a very particularized and egregious set of circumstances before us, my approach would be to couch the restraint in terms of a general rule, thus allowing for the

1. In *D.M.*, I joined a dissent by Madame Justice Newman, who argued against a bright-line view that expungement must be automatic in the instance of acquittals; the dissent in *D.M.* would apply the factor-based approach set forth in *Wexler* to acquittals in order to ensure the propriety of expungement. Because the offense in *D.M.* involved a schoolteacher's alleged sexual contact with a minor whose testimony was not discredited, Justice Newman did not perceive expungement to be appropriate.

possibility for further evaluation in cases presenting exceptional circumstances.